IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

ALEX MUNDY,

    Plaintiff,

v.                                                                                         Case No: 20cv847

BOARD OF REGENTS FOR
THE UNIVERSITY OF WISCONSIN
SYSTEM,

    Defendant.

## COMPLAINT

NOW COMES the plaintiff, Alex Mundy, by Paul A. Kinne of Gingras, Thomsen & Wachs, who hereby submits the following:

### NATURE OF PROCEEDINGS

1. This case is being brought pursuant to Title II of the Americans with Disabilities Act and the Rehabilitation Act, whereby the plaintiff alleges that the Board of Regents for the University Of Wisconsin System (the University) discriminated against the plaintiff by depriving her of educational opportunities on account of her disability (anxiety and Attention Deficit Hyperactivity Disorder (ADHD)).

### JURISDICTION AND VENUE

2. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because all claims arise under federal law.

1

3. Venue is proper under 28 U.S.C. § 1391 in that all of the acts alleged to have been committed by the defendants occurred within the Western District of Wisconsin.

## PARTIES

4. Plaintiff Alex Mundy (Mundy) is an adult resident of the State of Wisconsin, and at all times relevant hereto, has resided within the Western Judicial District of Wisconsin.

5. The defendant University is a public university organized and operated under the laws of the State of Wisconsin.

6. At all times relevant to this matter, the University employed Cameron Currie.

## FACTUAL BACKGROUND

7. Mundy is a disabled university student, as defined under the Americans with Disabilities Act and the Rehabilitation Act. Specifically, Mundy has been diagnosed with an anxiety disorder and with ADHD. These conditions are worsened by heightened levels of stress.

8. Her disabilities substantially limit her ability to think, work, study and communicate.

9. At all times relevant to this case, Mundy was enrolled in a Master of Science (MS) (Research Option) program through the Department of Bacteriology.

10. A research option student is expected to perform independent research under the guidance of a research mentor. Completion of a research project is required to complete the degree.

11. Other related degree requirements include completing required coursework, selecting a research committee, preparing a research proposal to present at a first year committee

meeting, and preparing and defending a research thesis.

12. A student in the research MS program is advised throughout by a research committee. The student's primary research mentor is a member of the committee. Otherwise, the committee is selected by the student with the assistance of the student's research advisor and the approval of a MS program advisor. A research committee for any given student was to be formed withing six months of entry into the program.

13. In the program, the student was required to meet periodically with the research committee, as scheduled by the student and research advisor, to discuss project objectives and to determine progress and satisfaction of deadlines and requirements.

14. *You get approval from your research advisor and then schedule the next meeting

15. The first year meeting with the research committee serves several distinct goals. It is the way in which the First Year student introduces the committee members to the research project plan. It is also a method by which to assess whether training is satisfactory, and to evaluate the planned and completed coursework, ensuring that it is aligned with the research and future goals.

16. To facilitate this process, the student writes and distributes a research proposal to the committee members at least two weeks prior to the first year meeting.

17. Currie served as Mundy's primary research mentor and academic advisor in the MS research program. The University requires this relationship to be a student / teacher relationship. Accordingly, Currie exercised influence over Mundy's grades and had significant control over Mundy's progress in her research and the completion of her degree. Currie further supervised Mundy's paid work in the research lab.

18. Near the beginning of her enrollment in the MS Bacteriology program, Mundy

spoke with University officials about her disability. Her disability is recorded with the UW McBurney Disability Center.

19. Officials at the disability center identified allowing Mundy to engage in remote work as part of her studies as a reasonable accommodation for her disability. More specifically, the University allowed Mundy extended time to do work / exams and quiet, individual separate spaces to work / take exams.

20. On May 29, 2019, Mundy met with Professor Cameron Currie (Currie) to discuss progress on her master's degree research project. At this meeting, Currie chastised Mundy for working remotely. Mundy responded, disclosing her disability and explaining her need to work remotely as a reasonable accommodation. She further explained that added stress exacerbated her disability.

21. On June 6, 2019, Mundy emailed Currie to request permission to attend a once per week graduate writing group. Her attendance at this group would have provided her with additional mentorship and feedback on her work, thus improving her academic progress.

22. On June 11, 2019, Currie responded to Mundy's June 6 email. He "reminded" Mundy that she was doing a research master's program, and that she was being paid for the research associated with that. He told her that they would have to meet in order to set specific work hours and expectations. Most significantly, Currie forbade Mundy from working remotely, at all. He also required her to start submitting weekly reports of her work.

23. No other similarly situated, non-disabled students were required to work set hours or were prohibited from working remotely. Moreover, no similarly situated, non-disabled students were required to submit weekly reports.

24. On June 27, 2019, Mundy met with Currie, for the first time since his June 11 email. At this meeting, Currie ordered Mundy to begin making figures for her data. Below are representative examples of "figures" that Currie required of Mundy.



Strati *et al. Microbiome* (2017) 5:24    Page 3 of 11

**Fig. 1** PCoA of bacterial beta diversity based on the **a** unweighted and **b** weighted UniFrac distances and **c** Bray-Curtis dissimilarity. Autistic and neurotypical subjects are coloured in *orange* and *blue*, respectively. The constipation status of the subjects is indicated according to different shapes, *circles* for non-constipated and *triangles* for constipated individuals



**Fig. 2 a** Mean relative abundances (%) of *Firmicutes* and *Bacteroidetes* in autistic (AD) and neurotypical (NT) subjects; *$p < 0.005$, Wilcoxon rank-sum test on the *Firmicutes/Bacteroidetes* ratio. **b** Welch's *t* test statistics of the relative abundances of bacterial phyla in autistic and neurotypical subjects. *Orange bars* indicate significant FDR-corrected *p* values adjusted for multiple comparison controlling the family-wise type I error rate



Fig 1. Phyla comparison between ASD children with FGID, ASD children without FGID, NT siblings with FGID and NT siblings without FGID, using Illumina V1-V2 and V1-V3 datasets. The average relative abundance of each phyla (relative abundance ≥ 0.02) is shown for ASD w FGID, ASD w/o FGID, NT w FGID and NT w/o FGID for each of the two sequencing datasets (See S1 and S2 Tables for means ± standard deviations).

doi:10.1371/journal.pone.0137725.g001

PLOS ONE | DOI:10.1371/journal.pone.0137725   October 1, 2015                                   10 / 19

25.     When Mundy explained that she lacked the technical knowledge to make these figures, but that she would work with someone to comply with his request, Currie became angry. He told Mundy that she should have been acquiring this knowledge in her spare time over the past spring semester, when prior to June 27, he never mentioned the need for Mundy to acquire this skill set.  Mundy then explained that she had begun to learn the necessary skills to make figures over the past month.  Currie replied that she was taking too long and the materials she was using were a waste of time. He went on to criticize Mundy for allegedly not working hard enough, and Currie stated that he wanted to see her in the lab on evenings and on the weekends.  He told her that she needed to spend the next two weeks making figures.  In the end, they agreed that she would do a literature search and then send him ideas for the figures that could be made.

26.     On August 1, 2019, Mundy reached out to Charles Kaspar, the Department of Bacteriology Chairperson and the academic grievance advisor, to schedule a time to discuss her

academic program and to obtain career advice.  Mundy and Kaspar agreed to meet on August 16.

27. On August 13, 2019, Mundy and Currie met.  Currie wanted to go over Mundy's figures.  He became angry when Mundy informed him that her figures had not been created yet, because they had agreed in advance of the meeting that she would provide him only with ideas for figures.

28. Currie then criticized Mundy, again accusing her of not working hard enough, and he expressed his concern over the lack of "deliverables."  He again told her she needed to be in the lab on weeknights and weekends.

29. On August 16, 2019, Mundy met with Kaspar.  She shared her concerns over the manner in which Currie was treating her.  Mundy further expressed her concern that Currie refused to set a time for Mundy's first year research committee meeting.  Kaspar informed Mundy that the research committee meeting should have already occurred and that it was not a requirement for Mundy to produce figures for her work.  Mundy further expressed her wish to have four committee members, as she was concerned about potential conflicts of interest between some of the possible members she was planning to have on her committee.  Kaspar agreed this would be a good idea and encouraged her to have a four-member committee.

30. On August 27, 2019, Currie agreed to schedule Mundy's first year committee meeting.

31. August 28, 2019, Currie arbitrarily refused to allow Mundy to have four members on her research committee, instead insisting that she have only three.  This was in contradiction to Kaspar's recommendation that Mundy have four members.

32. On September 25, 2019, Mundy asked Currie for guidance and direction with respect to preparation for her committee presentation.  He did not respond.

33. On October 1, 2019, Mundy asked Currie for guidance and direction with respect to preparation for her committee presentation. He stated they could meet the following day.

34. On October 2, 2019, instead of discussing Mundy's committee meeting and presentation scheduled for October 8, for which the meeting was intended, Currie informed Mundy that he was cutting her Research Assistant stipend.

35. Mundy immediately spoke with human resources, who affirmed that she was making the correct amount by contract.

*36.* Later that same day, when Mundy approached Currie with this information, he threatened to fire her if she did not consent to the stipend reduction. This reduced Mundy to tears, after which Currie told her that if Mundy proved her worth, he would consider not reducing her stipend.

37. A paid assistantship was an essential part of Mundy's education and the completion of her program. The appointment as a 50 percent time Research Assistant (RA) supported the pursuit of her dissertation or degree research, pursuant to the contract she had with the University.

38. To complete the MS research program, Mundy needed not only a research advisor but a position in a lab. All MS research option students had a Research Assistant (RA) position. The RA position paid students through tuition remission and in a living stipend. If Currie had terminated Mundy from her RA position, she would have effectively been expelled from the program. She would have lost access to the lab to do her research, and she would have had to pay her tuition directly.

39. On October 4, 2019, Mundy met with Kaspar to file a formal complaint over Currie's longstanding mistreatment of Mundy on account of her disability.

40. Also on this day, Mundy sent Currie a copy of her first-year committee meeting presentation. Mundy further asked Currie for guidance and direction with respect to preparation

for her committee presentation. He did not respond.

41. On October 8, 2019, Mundy appeared for her first-year committee meeting. Prior to this meeting, Currie had never informed Mundy that prior to the meeting, students like Mundy were required to submit a formal, written research proposal to be reviewed and discussed at the committee meeting.

42. On October 9, 2019, Currie had a duty to mentor and teach Mundy, particularly with respect to her first-year committee meetings. Mundy requested a meeting with Currie to discuss her first-year committee meeting, but he never responded.

43. On October 10, 2019, Mundy informed Currie that she wanted to discuss a plan to move forward on her research project, but he never responded.

44. On November 6, 2019, Currie apologized to everyone in the lab about his recent "temperamental behavior," and promised to reach out to everyone to schedule times to meet individually. Currie informed Mundy that he would meet with her after Mundy's next lab meeting presentation around November 20. However, Currie did not appear for the lab meeting presentation, nor did he follow-up to reschedule.

45. Around February 4, 2020, Currie and Mundy were scheduled to meet to discuss her committee meeting and progress in her research; however, a time overrun prevented the meeting from occurring.

46. On February 11, 2020, Currie and Mundy were again scheduled to meet to discuss her committee meeting and research progress. When Mundy reached out to confirm their meeting, Currie stated he wasn't available to meet. Mundy proposed alternate meeting times. Currie did not respond.

47. On February 18, 2020, Mundy informed Currie that she wanted a meeting with

Currie. Currie stated he did not have time. Mundy stated she wanted to discuss her program, her data analyses and to make sure she was on track to graduate on time. Currie did not respond.

48. On February 25, 2020, Currie informed Mundy that he would reach out to her for a meeting. He failed, again, to do so.

49. On March 25, 2020, Mundy once again reached out to Currie in an attempt to schedule a meeting. Once again, Currie failed to respond to set up a meeting, stating only that they would "meet soon."

50. On March 30, 2020, Mundy requested a meeting with Currie. Again, he did not respond.

51. On April 22, 2020, Mundy requested a meeting with Currie. Currie did not respond.

52. On April 28, 2020, Mundy requested another meeting with Currie. Currie did respond this time, asking to meet after final exams were finished. Mundy asked that they set a firm date. Currie did not respond.

53. On April 30, 2020, Mundy made another request for a conference with Currie. He did not respond.

54. On May 4, 2020, Mundy made another request for a conference with Currie. He did not respond.

55. On May 6, 2020, Mundy made yet another request for a conference with Currie. He did not respond.

56. On May 8, 2020, Mundy submitted a complaint to Charles Kaspar, the departmental Grievance Advisor (GA).

57. On May 13, 2020, Currie finally met with Mundy to discuss her research project and instruct her.

58. The last time Currie met with Mundy individually was October 2, 2019.

59. On information and belief, between October 2, 2019 and May 8, 2020, Currie had offered multiple meeting times to Mundy's non-disabled peers *and* he met with them regularly.

60. Currie was the primary faculty member who could provide Mundy with the instruction she needed to complete her degree on time.

61. The failure to give Mundy the instruction to which she was entitled caused her specific injury. When the 2019-20 academic year began, Mundy was on track to complete her Master's research thesis by June 30, 2020. Currie's failure to provide Mundy with instruction has delayed Mundy's graduation date.

62. Even after the May 13, 2020, meeting, Currie has again failed to meet with Mundy as required.

63. On June 15, 2020, Currie revoked Mundy's access to the lab calendar.

64. On June 30, 2020, Currie did not renew Mundy's Research Assistantship contract.

65. On July 6, 2020, Currie revoked Mundy's access to the lab and the resources and tools essential for Mundy to complete her MS degree.

66. The University receives federal funds.

**MUNDY'S FIRST CAUSE OF ACTION AGAINST THE UNIVERSITY - VIOLATION OF THE ADA AND THE REHABILITATION ACT**

67. Plaintiff Mundy restates the previous paragraphs as if set forth fully herein.

68. By engaging in the conduct described above, the University violated Mundy's rights by discriminating against her on account of her disability, as prohibited by the ADA and the Rehabilitation Act.

69. By engaging in the conduct described above, the University violated the ADA and the Rehabilitation Act when it knowingly allowed a hostile learning environment to exist that adversely affected Mundy's academic achievement, on account of her disability. That is, the University acted toward Mundy in bad faith or with gross misjudgment.

70. The University intentionally excluded Mundy from educational opportunities and her academic program because of her disability.

71. Not only did the University, via Currie, discriminate against Mundy on account of her disability, but it also failed to accommodate her disability.

72. The hostile and discriminatory environment has caused Mundy severe and permanent economic, physical and emotional injuries.

WHEREFORE, the plaintiff requests a trial by jury along with the following relief:

A. Unspecified compensatory damages;

B. Any injunctive relief that the Court may deem just and proper to award;

C. An award of Plaintiffs' reasonable attorneys' fees and costs incurred in this action;

D. Pre- and post-judgment interest; and

E. Any other such relief as the Court may deem appropriate.

## JURY DEMAND

The plaintiff respectfully requests that this matter be tried before a jury of six (6) competent persons.

Dated this 14th day of September, 2020.

**GINGRAS THOMSEN & WACHS LLP**
Attorneys for Plaintiff


<u>s/ Paul A. Kinne</u>
Paul A. Kinne
State Bar Number: 1021493

8150 Excelsior Drive
Madison, WI 53717
Phone: (608) 833-2632
Fax: (608) 833-2874
Email: kinne@gtwlawyers.com