IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ALEX MUNDY,

Plaintiff,

v.

BOARD OF REGENTS FOR THE
UNIVERSITY OF WISCONSIN SYSTEM,

Defendant.

OPINION and ORDER

20-cv-847-jdp

---

Plaintiff Alex Mundy was a graduate student in bacteriology at the University of Wisconsin—Madison, working on her master's degree and employed as a research assistant in the lab of professor Cameron Currie. In her second year, Mundy failed to make substantial progress on her thesis, which was both an academic requirement and the primary research project for which she was paid. Currie declined to reappoint Mundy as a research assistant and recommended that Mundy be awarded a non-thesis master's degree on the basis of her coursework. Mundy blames her failure to complete her thesis on Currie's lack of mentorship and his refusal to accommodate her anxiety disorder by allowing her to work remotely. Mundy has sued Currie's employer, the Board of Regents for the University of Wisconsin System, asserting claims under the Americans with Disabilities Act and the Rehabilitation Act.

The Board of Regents moves for summary judgment. Dkt. 19. Currie's unresponsiveness was a general complaint among those who worked in his lab, and Mundy has adduced no evidence that any lack of responsiveness was motivated by disability-based hostility, nor has she adduced evidence to show that she would have made adequate progress if Currie had met with her more often. Mundy did not request any accommodation for her anxiety through the formal channels available to her. And in any case, she worked remotely despite Currie's

objection, and still did not make progress on her thesis. Mundy has not adduced evidence from which a reasonable jury could find that Currie discriminated against her on the basis of a disability, or that the university failed to accommodate her disability. The court will grant summary judgment to the Board of Regents.

UNDISPUTED FACTS

The court begins with an evidentiary issue. Mundy opposes the Board of Regents's motion primarily on the basis of her own declaration. Dkt. 38. A declaration is admissible summary judgment evidence, so long as it is based on the declarant's personal knowledge. But Mundy's declaration includes assertions that are not based on her personal knowledge, such as graduate school policies and the purposes of those policies, *id.*, ¶ 12, the activities of other researchers in Currie's lab that Mundy did not observe, *id.*, ¶ 22, and Currie's knowledge, intentions, and motivations, *id.*, ¶ 91. The court will disregard Mundy's declaration statements that cannot be based on her personal knowledge, those for which she does not explain how she has personal knowledge, and those that are merely conclusory and not factual assertions at all.

A second problem with Mundy's declaration is that it contradicts her deposition testimony. The sham affidavit rule prevents a party from submitting and relying a declaration that contradicts the party's prior deposition or other sworn testimony. *James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). The purpose of the rule is to prevent a party from avoiding summary judgment by ginning up a factual dispute that legitimate evidence does not support. There are three recognized exceptions to the rule: declaration statements based on newly discovered evidence, corrections of demonstrably incorrect deposition testimony, and clarifications of confusing or ambiguous deposition testimony. *Id.* at 317.

The Board of Regents identifies three significant and unexplained contradictions between Mundy's deposition testimony and her declaration. Dkt. 46, at 5–14. First, in her declaration, Mundy invokes the Graduate Assistantship Policies and Procedures to justify her failure to request disability accommodation through the available formal channels. But in her deposition, Mundy did not cite these policies, and she acknowledged that the policies were not in effect during 2018 and 2019. Second, in her deposition, Mundy repeatedly testified that she could not recall specific conversations with Currie and other university personnel. But in her declaration, she disputes the accounts of the other participants in those same conversations. She offers no explanation for her newly recovered memories, so these declaration statements fall within the scope of the sham-affidavit rule. *See Beckel v. Wal-Mart Assocs.*, Inc., 301 F.3d 621, 623–24 (7th Cir. 2002). Third, Mundy's declaration statements about her lab notebook contradict her deposition testimony. Mundy's declaration says that she didn't have access to an official lab notebook, and if she did, she left it at the lab. But in her deposition, she testified that she had a black lab notebook, that she kept it, and at the time of her deposition she had no idea where it is or what was in it. Mundy doesn't explain any of these contradictions, so the court will credit her deposition testimony and disregard her declaration on these topics.

The bottom line is that the court will credit Mundy's declaration insofar as it reports what she saw, said, and did, and so long as it does not contradict her deposition testimony. With that preliminary explanation, the following facts are not genuinely disputed, except where noted. Additional facts will be discussed where they are relevant to the analysis section.

In June 2018, Mundy enrolled in the graduate program of the Department of Bacteriology at the University of Wisconsin—Madison to pursue a Master of Science degree. She expected to graduate two years later, in May or June of 2020.

3

Mundy had previously received disability services through the McBurney Disability Resource Center at the university. Her records at the McBurney Center indicate that she suffers from "adjustment disorder with anxiety" and "other specified anxiety disorder," with a "rule out" diagnosis of ADHD (attention deficit hyperactivity disorder). Dkt. 50-1 (clinician statement).[1] For purposes of summary judgment, the court assumes that Mundy has an anxiety disorder that constitutes a disability under federal law.

Mundy sought to pursue a research-track master's degree, as opposed to a coursework degree. To earn the research-track degree, Mundy would need, in addition to coursework, to complete an independent research project and write a 15– to 20–page thesis reporting the results. The research project would require Mundy to find a faculty member to be her research mentor. Generally this would be a faculty member who could provide funding for the project through a research grant for which the mentor was the principal investigator. To finish the research-track master's degree in two years, with its a combination of coursework and the independent research project, would require full-time effort.

Dr. Cameron Currie is a full professor of bacteriology at the university. He runs a research lab that employed 19 researchers, one of the larger labs in the bacteriology department. Currie maintained a busy schedule of teaching, research, and service, which included working on grant applications and administration, and travel for four to six research presentations each year.

---

[1] A "rule out" diagnosis means that the patient has symptoms that may be consistent with that diagnosis, but further investigation would be required to confirm it or rule it out. Mundy contends that she suffers from anxiety disorder and ADHD, but she provides no medical evidence of that diagnosis, relying solely on her own declaration. Dkt. 41, ¶ 4. The precise diagnosis is not material to the summary judgment motion.

When Mundy applied to the bacteriology graduate program, Currie had grant funding available for a research assistant. He agreed to hire Mundy as a research assistant and become her research mentor. With Currie's commitment, Mundy was accepted into the bacteriology graduate program. She was appointed to her research assistantship for a year, with the potential for renewal. Her duties as a research assistant included working on various projects in the Currie lab, but her primary duty was to complete her independent research project and write her thesis on it, providing the basis for a publication from Currie's lab. Mundy's research project involved comparing the microbiomes of children with autism to those of their parents and siblings using genetic sequencing of the biomes.

In the fall of 2018, Currie helped Mundy obtain human microbiome samples and worked with her to develop a testable hypothesis that she could apply to the samples. In early 2019, Mundy asked Currie for help with the computer analysis of the genetic data collected from the biome samples. This type of analysis was not within Currie's expertise, so he connected Mundy with Dr. Lindsay Kalan, an assistant professor of medical microbiology. In mid-February, Mundy sent Kalan her raw data, and the staff in Kalan's lab began the analysis, which ended up taking several months due to the volume and complexity of Mundy's raw data. In the meantime, Mundy began to work on the introduction and background sections of her thesis.

Signs of trouble surfaced late in May, 2019. Currie and Mundy met on May 28 to discuss her progress. Currie told Mundy that the analysis of her data should be done soon so they could decide whether they needed more samples. And Currie was concerned that Mundy was too often absent from the lab and that she was not doing the lab work for which she was being paid. Mundy told Currie that she was working remotely because it was hard for her to

write in her lab office space because of the noise. (Whether Mundy told Currie about her anxiety disorder at this meeting is genuinely disputed. Mundy testified that she did. Dkt. 17, at 54:12–55:3. Currie says he didn't know about her disability until June, 2020. Dkt. 25, ¶ 142–43.)

Currie followed up with a pointed email on June 11, in which he told her that he was not comfortable with Mundy working remotely at all. If she needed a quiet space to write, he offered to put her in the "writing office" of the lab for the summer. He acknowledged her heavy first-year course load and that there had been delays in the computer processing of her data, but he told her that he expected her to work harder on her research over the summer. Currie told Mundy that he would set regular work hours for her and that he wanted weekly progress reports. Mundy responded by email later that day with a progress report and a set of objectives to be accomplished by the end of summer. One of her end-of-summer objectives was to "[h]ave initial data analyzed—best figures to start with."

On June 13, 2019, Kalan provided Mundy with a processed data file and some sample figures showing how the data might be analyzed and illustrated. Kalan also included a script written in R, a statistical programming language, that Mundy could use to explore the data file. Kalan and Mundy met a couple of weeks later, and Mundy began learning to use R with the help of colleagues in Currie's lab.

Currie and Mundy met on June 27, 2019. Currie stressed the importance of developing the figures that would illustrate the results of her analysis, which would be the heart of her thesis. Currie gave Mundy specific instructions on the figures that would be most useful and listed them on his whiteboard.[2] They agreed that Mundy would have five critical figures done

---

[2] Mundy says in her declaration that he just wrote the word "figures" on the whiteboard and

6

by the end of summer so that she could write the results section of her thesis in the fall of 2019.

Currie and Mundy met on August 13, 2019. Currie expressed concern with Mundy's progress because she had not yet created any original figures for her thesis. Although Mundy had registered for a full-time load of four research credits for the summer, she was not in the lab full time in August.

Mundy began preparing for her first-year committee meeting, at which she would present her research project to the faculty members who would advise and evaluate her thesis. Mundy's committee consisted of Currie, Kalan, and Dr. Federico Rey, an associate professor of bacteriology. Mundy made her presentation on October 8, 2019. Mundy had still not yet created any original figures to demonstrate her analysis of the biome data; she included in her presentation only the sample figures that Kalan had created for her. The committee was not pleased with Mundy's progress, and Rey questioned whether Mundy really understood what she was doing.

About this same time, Mundy began to complain about Currie. On October 4, 2019, Mundy met with Dr. Charles Kaspar, the bacteriology department chair and co-director of the master's program. Mundy had two concerns. First, Currie had discovered that Mundy had been paid, in error, at the Ph.D. level for her first year, and he proposed to reduce her stipend to the master's level for the second year. (The department ultimately kept Mundy at the Ph.D.-level stipend.) Second, and more important to this case, Mundy complained to Kaspar about a lack

---

circled it. But the court will not credit her declaration on that point because in her deposition she testified that she didn't remember exactly what he wrote, and she could not recall whether they discussed any specific figures. Dkt. 17, 72:25–73:2.

of responsiveness from Currie. The parties dispute whether Mundy cited her disability as the reason for Currie's lack of responsiveness: Kaspar testified in deposition that she did not (Dkt. 16 at 28:15–29:11); Mundy's declaration said she did (Dkt. 41, ¶ 44). The court credits Mundy's declaration on this point, so the matter is genuinely disputed. But there's no dispute that Mundy did not submit a formal written grievance or ask for an accommodation for her disability at the October 4 meeting with Kaspar. Currie was not informed of Mundy's October 4 complaint.

Over the next few months, Mundy and Currie did not meet in person, despite Mundy's requests. Currie was out of the lab a great deal during the fall of 2019 caring for a new child. Mundy herself was out of the lab for much of December 2019 and February 2020. In March, the coronavirus pandemic prompted the Currie lab to move to remote work, and Currie took on additional projects related to COVID-19 research. Mundy requested more meetings with Currie throughout the spring, but Currie did not respond. Mundy continued sending Currie updates about her work and the guidance she was receiving from other graduate students.

On May 8, 2020, Mundy emailed Kaspar to complain that Currie had retaliated for Mundy's October 4, 2019 grievance against Currie by refusing to meet with her. Dkt. 27-1, at 7–8. (Mundy had indeed complained to Kaspar about Currie, but she had not filed any formal grievance, and Currie had not been informed about the complaint.) Mundy's May 8 email did not mention her disability. Kaspar treated Mundy's complaint as a formal grievance and divided it into an academic grievance and an employment grievance. Kaspar and other administrators began the process of addressing them through the university's formal grievance process.

While the grievances were pending, Mundy continued work on her thesis. In mid-May, 2020, Currie and Mundy exchanged emails about her thesis. Mundy presented her project at a meeting of the Currie lab on May 12. Currie and Mundy met two days later, their first meeting since October 2019. Currie gave pointed instructions on how Mundy was to proceed, and he followed up with an email identifying the specific figures Mundy was to produce. Currie enlisted a Ph.D. student, Jenny Bratburd, to assist Mundy in creating the figures. Mundy continued to send weekly progress reports to Currie. Currie told Mundy to skip the lengthy introduction, suggested refinements to the methods section, and told her to focus on completing the figures and the data analysis section.

On May 29, 2020, Kaspar informed Currie that Mundy had filed a grievance against him for failing to provide mentorship. To prepare a response to the complaint, Currie got the records of Mundy's card access to the lab, which recorded Mundy's entry into the lab on only 50 days between June 2019 and March 2020. Other research assistants in Currie's lab had entered more than 200 times each in the same period.[3]

On June 4, 2020, Currie received permission to offer Mundy a coursework master's degree due to her failure to make progress on her thesis. Currie emailed Kaspar saying that he would not reappoint Mundy as a research assistant. On June 30, Mundy's research assistant contract with the Currie lab expired. Mundy declined the offer of a coursework master's degree.

The complaints were resolved through university's formal process, with findings issued on July 3, 2020, that Currie had not retaliated against Mundy. Dkt. 29-6; Dkt. 29-7. The

---

[3] The parties agree that key card access is an imperfect measure of attendance. But the extraordinary disparity between Mundy's recorded access and those of the other research assistants is telling. And Mundy's pattern of absence is corroborated by the deposition testimony of Mundy's office mate, Kirsten Gotting. Dkt. 34, at 14:3–15:15.

committees found that Currie's lack of responsiveness was caused both by Currie's family obligations and Mundy's infrequent presence in the lab.

ANALYSIS

Mundy originally brought three claims, alleging that the Board of Regents: (1) excluded Mundy from educational opportunities on the basis of her disability; (2) failed to accommodate her disability; and (3) maintained a hostile learning environment, all in violation of both Title II of the Americans with Disabilities Act and the Rehabilitation Act. Mundy has not pressed all these claims through summary judgment, so the court begins by identifying the claims that remain viable.

The Board of Regents contends that it is entitled to sovereign immunity from suits under the ADA. Mundy did not respond to the point, so the court deems any claims under the ADA to have been forfeited. *See Alioto v. Town of Lisbon*, 651 F.3d 715, 721 (7th Cir. 2011). The court will evaluate Mundy's claims only under the Rehabilitation Act, which the parties agree is applicable to the Board of Regents because the university receives federal funding.

Mundy did not respond to the Board of Regents's arguments regarding the hostile learning environment claim, so that claim is also forfeited. And even if had not been forfeited, the court discerns no evidence of a hostile learning environment in the evidence submitted to the court at summary judgment.

What remains then are two claims under the Rehabilitation Act: that Mundy was excluded from educational opportunities because of her disability, and that the university failed to reasonably accommodate her disability.

## A. Exclusion claim

To establish her exclusion claim, Mundy must show that 1) she suffers from a disability; 2) that she's otherwise qualified to participate in her academic program; and 3) that she was excluded from the program because of her disability. *Novak v. Bd. of Trs. of S. Ill. Univ.*, 777 F.3d 966, 974 (7th Cir. 2015). Mundy must also show that her graduate program received federal financial support. *Id*. The parties agree that it did. And for purposes of summary judgment, the court assumes that Mundy's anxiety disorder constitutes a disability under the Rehabilitation Act. Mundy's problem is causation.

Mundy implicitly concedes that she did not make adequate progress on her thesis by the end of her second year. Mundy's theory of the case is that Currie refused to mentor her, and that the lack of mentorship prevented her from completing her thesis, which led to her termination from his lab. But it is not enough for Mundy to show that Currie failed as a teacher. Mundy must show that Currie failed to mentor her because of her anxiety disorder, or in the words of the Rehabilitation Act, that Currie discriminated against her "solely by reason of her . . . disability." 29 U.S.C. § 794(a).[4] And she must show that if Currie had not failed to mentor her, she would have successfully completed her thesis. Mundy has failed to adduce evidence from which a reasonable jury could find that Currie failed to mentor her because of her disability, or that had Currie provided more mentoring, Mundy could have finished her thesis.

---

[4] The Board of Regents assumes in its briefs that Mundy must prove "but for" causation, meaning that, "but for [her] disability, [she] would have been able to access the services or benefits desired." *A.H. by Holzmueller*, 881 F.3d at 593. That's the standard under the ADA, but the court of appeals recently clarified that "[t]he Rehabilitation Act has a stricter causation requirement [than the ADA]: the plaintiff's disability must be the sole reason for the alleged discriminatory action." *Conners v. Wilkie*, 984 F.3d 1255, 1260 (7th Cir. 2021). But Mundy's claim would fail even under the more lenient "but for" standard.

Mundy contends that Currie failed to meet with her, particularly during what Mundy refers to as the "critical period" from October 2019 to May 2020. But Currie's lack of responsiveness was a common complaint within his lab, and every lab member had complained to the lab manager about it. Dkt. 45, ¶¶ 67, 72, 415. There are non-discriminatory explanations for Currie's lack of responsiveness. Even under normal circumstances, Currie was a busy professor running a large lab, and he expected independent work from all his students. And he was out of the lab attending to family obligations for much of the fall of 2019. In March, 2020, Currie's lab converted to remote work because of COVID-19. And Mundy herself was absent from the lab far more than others, which explains why some members of the lab might have had a few more personal meetings with Currie than Mundy did. Currie was unresponsive to Mundy and others, but Mundy must show that the Currie's responsiveness was motivated solely by her disability.

Mundy contends that Currie's motives are shown by relevant comparators, specifically members of the lab with whom Currie had scheduled meetings in February 2020. Dkt. 37, at 21. She adduces a screen shot of a meeting schedule. Dkt. 38, ¶ 55 and Ex. 3.[5] But Mundy herself is scheduled for a meeting on this document. Mundy says that Currie did not actually meet with her, but Mundy cannot show whether he actually met with any of the others either. She also points to Jenny Bratburd, whose appointment was extended over the summer of 2020 to allow her to finish her degree. But Bratburd is not a useful comparator. She was a Ph.D.

---

[5] The Board of Regents asks the court to strike this document because it wasn't produced in discovery. Dkt. 48, ¶ 133. But the Board of Regents did not provide evidentiary support for the alleged discovery violation, so the court declines to strike the document.

student, not a master's student. And, more important, there is no evidence that Bradburd was failing to make progress on her research.

Mundy contends that Currie made disparaging comments about her disability in August and October, 2019. As Mundy describes the comments in her deposition, in August Currie said that he was worried about Mundy falling behind because of "her learning issues." Dkt. 17, 94:4–20. And in October, Currie said that he would keep Mundy at the Ph.D.-level stipend if she could prove her worth in the lab and not fall behind because of her learning issues. *Id*., 110:5–17. (Currie denies making the comments, but for purposes of summary judgment, the court credit's Mundy's deposition testimony on this disputed fact.) But the comments, as Mundy recounts them, are not disparaging. Currie's concern that Mundy not fall behind is a legitimate pedagogical and employment matter. Assuming, as Mundy contends, that she had told Currie about her anxiety disorder, it would have been appropriate for Currie to discuss the effect of her anxiety disorder on her work. Expressing concern for the effect of Mundy's learning issues on her work would not, without more, be evidence of any discriminatory intent.

Mundy contends that Currie imposed on her special rules and monitoring that were not applied to other students. But Mundy has no basis in her personal knowledge to know whether other students were required to work regular hours and to submit weekly reports. Currie has applied these rules to others. Dkt. 45, ¶¶ 127, 129. And Currie had legitimate concerns about Mundy's academic and work performance in May 2019, so there was a legitimate, non-discriminatory reason for Currie to impose these rules on Mundy. All three members of Mundy's committee were dissatisfied with her progress in October 2019, and Mundy has submitted no evidence that the other members of the committee knew anything at all about her anxiety disorder.

Mundy cannot show that Currie's dissatisfaction with her work was a pretext for discrimination. In June, 2019, Currie had specifically directed Mundy to prepare the figures that would form the basis for the analysis section of her thesis. But Mundy failed to follow his instructions. She continued to work remotely despite Currie's instructions, spent time on other parts of her thesis, and worked on other projects that had nothing to do with her thesis. Currie had helped her develop her hypothesis, connected her with other professors and resources, and gave input on her drafts. In May, 2020, Currie enlisted Ph.D. student Jenny Bratburd to help directly with Mundy's figures. Mundy has simply failed to identify anything further that she needed from additional one-on-one meetings with Currie. At her deposition, only a little more than a year after the end of her research assistantship, Mundy could not recall the hypothesis that her research was meant to test. Dkt. 17, 52:10–23. Mundy testified that she had taken her lab notebook when she left Currie's lab, but she hasn't produced it to show that she made any progress on her thesis. Mundy has failed to provide any evidence that she made meaningful progress on her thesis in her second year, and she has not explained what else she needed from Currie.

Mundy has not adduced evidence from which a reasonable jury could find that Currie failed to mentor Mundy or terminated her research assistantship because of her disability, or that but for Currie's lack of mentorship, Mundy would have successfully completed her thesis. The Board of Regents is entitled to summary judgment on Mundy's exclusion claim.

## B. Failure to accommodate claim

To prevail on her failure to accommodate claim, Mundy must show that (1) she was a qualified individual with a disability; (2) defendant was aware of her disability and (3) defendant failed to reasonably accommodate her disability. When a student makes a request

14

for a reasonable accommodation, the parties must engage in a flexible, interactive process to determine a reasonable accommodation. *See Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 693 (7th Cir. 1998). Mundy's problem here is that she has not adduced evidence that her requested accommodation—remote work—would have allowed her to complete her thesis.

There is no dispute that Mundy did not make any request for accommodation through the formal channels available to her. As a student, she could request accommodation through the McBurney Disability Resource Center at the university. As an employee, she could request accommodation through the Justin Sills, the divisional disability representative for the College of Agricultural and Life Sciences, the part of the university that included the bacteriology department. Mundy took neither of the available formal options.

Mundy contends instead that she requested accommodation from Currie himself, by asking to work remotely in May, 2019. The parties dispute whether Mundy framed her request as an accommodation for a disability or just a general complaint about the noisy workplace. But it is undisputed that, in response to Mundy's complaint, Currie offered her an alternative: a quiet space to work in the lab's writing office. Dkt. 45, ¶ 126. Mundy is not entitled to the accommodation of her choice. *Mobley v. Allstate Ins. Co.*, 531 F.3d 539, 546 (7th Cir. 2008). And Currie had legitimate reasons to refuse to allow Mundy to work remotely. Although he sometimes allowed successful students to work remotely while writing their theses and dissertations, Mundy had not demonstrated that she could be productive working outside of the lab.

Mundy adduces no evidence that she continued to work with Currie to come up with a mutually agreeable accommodation. Mundy's unilateral rejection of the writing office effectively terminated the interactive process. And an employee who rejects a reasonable

15

accommodation and terminates the interactive process is not entitled to relief. *Gratzl v. Office of the Chief Judges of the 12th, 18th, 19th & 22nd Judicial Circuits,* 601 F.3d 674, 682 (7th Cir. 2010).

Ultimately, the burden of showing that a reasonable accommodation would address the employee's needs remains on the employee. *Wheatley v. Factory Card & Party Outlet*, 826 F.3d 412, 420 (7th Cir. 2016); *Mays v. Principi*, 301 F.3d 866, 871 (7th Cir. 2002). Mundy has failed to show that her requested accommodation of remote work would have allowed her to meet the requirements of the master's program and her research assistantship. Despite Currie's objection, Mundy continued to work outside of the lab, either from home or various libraries on campus, throughout her second year. And yet she still failed to make meaningful progress on her thesis.

The Board of Regents is entitled to summary judgment on Mundy's failure to accommodate claim.

ORDER

IT IS ORDERED that:

1. Defendant's motion for summary judgment, Dkt. 19, is GRANTED.

2. Defendant's motion to stay case deadlines and the trial date, Dkt. 57, is DENIED as moot.

3. The clerk of court is directed to enter judgment in favor of defendant and close this case.

Entered January 11, 2022.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

17